Justice O'Connor, Judge Tallman, and Judge Bea, good morning, counsel, Mr. Oams. My name is Frank Sikitovich. I represent Charles Gillenwater. Actually, I was appointed to represent him. There was previous counsel, and Mr. Gillenwater had a conflict with previous counsel, at which point the magistrate in our district asked that I be appointed. And the reason I bring that up is I think the magistrate had hopes that I would have more of a trust relationship with Mr. Gillenwater because we come from similar backgrounds. We both served in the United States Marine Corps, both on a re-discharge, and there was some hope that we could have a trust relationship because of that. That's how I became on the case. Well, thank you for taking the appointment. This is a tough case. It's been a tough case, and it's been eye-opening going to North Carolina to visit my client and seeing where he is and the procedures that take place in a facility of that nature. Currently, he is in Buckner, North Carolina, in a federal medical detention facility. He's being held pretrial. He has been deemed incompetent to stay in trial, and there was some conflict with that because at the competency hearing, I made the decision not to allow my client to testify, and this was for various reasons, most of which was his actions in the courtroom during the hearing. That was taken up to the Ninth Circuit. The Ninth Circuit ultimately decided that it is the client's decision whether to testify at a competency hearing, and so we had to redo the competency hearing, allowing him to testify. We submitted his testimony to the court and then asked to rejoin the appeal in the hopes that it wouldn't delay any further. It's been over two years now since Mr. Gillenwater has been incarcerated, and I would also bring up that Mr. Gillenwater was incarcerated almost voluntarily. He sent emails, which the government alleged are in violation of the law. On their face, they appear to be that way, and then he contacted federal agents and indicated that he made these threats. The peculiar part is he was hoping to be detained. He thought his life was at risk, and the only safe place would be in a facility, a jail or a prison, and that's how he became into the custody of the United States government. Moreover, the reason I say that is the government will contend and has contended that it's in the government's interest to further this case under one of the cell requirements, and it's important for the government to do this. This was not a big investigation in looking into who's making threats. This was an individual who reached out to the government saying, I'm making threats. Mr. Gillenwater was approached earlier by government agents and said, we think we may have some threatening emails. Counsel, one of the concerns I have is I see a pattern of escalating threats of violence here. I mean, there are statements in these emails, I've made the decision to kill, I'm staging, one of us will not be living. I believe Judge Succo indicated he had some concerns as to whether or not your client, who apparently had access to weapons, and I guess there are still some weapons that are unaccounted for, that were in his possession. I think that the district court referenced the fact that he basically had the intent coupled with the present ability to carry out those threats, and yet we don't have a finding, or at least an opinion, from the BOP psychiatrist that he is a danger, at least in an institutional setting. But what about with regard to the putative victims here? Your Honor, Dr. Lucking has in his, which is the government's doctor, he has said in his report that Mr. Gillenwater is not a danger to himself, nor is he a danger to others. And as you indicated, that's within the institutional realm. He hasn't been a problem. But as you have indicated, if you look at his emails for the 18 months or so, they escalate. And what happens is he initially was a whistleblower, a legitimate whistleblower. There are newspaper articles submitted in the record where it's confirmed. The government does not object to that at all because it's true. In Las Vegas, he witnessed illegal activity, turned in the people to the government. Then he kept contacting the government to find out if anything would be done. He was getting frustrated because it appeared to him nothing was being done and it was a cover-up of sorts. You can watch in the emails how his anger increases. And the interesting part is the language he initially uses is language I heard frequently in Marine Corps boot camp. It's vulgar. It's intended to demean. And it's right. You can watch Full Metal Jacket this weekend and you'll hear the same things he was putting in the emails. But then towards the end of it, it did escalate to the point where he said, I will kill or I intend to kill or somebody will die. And what, in my opinion, in my argument on his behalf, is he was completely frustrated. Nobody would give him the time of day anymore. He needed to attract attention. I guess the conundrum that faces the court is what do we do with somebody like Mr. Gillenwater? As I understand it, the charges that he is facing, the guideline range is relatively low, and we've held him now for, as you say, two years. But what is to become of him? I mean, either we try to restore him to competency so that he can answer the charges or what? And it's the or what that I'd like you to address. If we grant your appeal and deny the government the right to involuntarily medicate him with psychotropic medications, what are we going to do with Mr. Gillenwater? Dr. Cloninger testified of a less intrusive alternative. And his testimony was, I think, logical. You've got an individual who doesn't trust the government. In fact, he thinks the government is conspiring against him. So the alternative that he advises is you get a doctor that's not associated with the government. You have him have therapy with the client and see if that works. But as I understand it from the record adduced in the district court, he cannot practically receive the kind of psychotherapy that Dr. Cloninger, the defense psychiatrist, recommended in that setting because of the nature of the institution. And as you say, you've been there. I've been there. I know what it looks like. But how do we assure the safety of the victims who receive these e-mails while he is receiving psychotherapy somewhere else if it's not in the institution? I would argue it needs to be in the institution. And I would argue that just because the facility has not done this previously does not mean federal judges can tell them this is the way it will be done now. Dr. Lucking testified at the last hearing it could be done. It has not been done. But isn't the problem, I believe the district court made a finding to this effect in rejecting Dr. Cloninger's proposed treatment plan. The finding was that he first has to acknowledge that he's ill, and that is one of the symptoms of a paranoid delusional disorder. And unless and until he is ready to acknowledge that, then he won't open himself up to psychotherapy or any kind of non-medicinal treatment. That's true, Your Honor. I'm just taking the approach of anything less intrusive than strapping an innocent man down, injecting him with psychotropic drugs, and the hope in 6 months, 12 months, 18 months he may be better. There is a less intrusive way to do that. This man has never been convicted of a crime. The government has alleged things. He sits there, an innocent citizen. Additionally, he should be treated not as a defendant but as a patient. Is it your proposal that we order this Cloninger recommended treatment of conversational therapy in the institution, in the prison? Absolutely. First, see whether it works, and if it doesn't work, then take up this issue again? That's exactly what I'm saying. And I think if it were not in the criminal setting, if my mother, for example, is in an adult care facility. But to do that and follow up on what Judge Tallman was saying, we would have to review this evidence de novo rather than for abuse of discretion. Are we allowed to do that under our jurisprudence? Under your jurisprudence, I don't think it's appropriate, but I've stood in front of it. Here's the problem. In Hinkson, we said that it's only an abuse of discretion if the trial judge's determination is illogical, implausible, or such that inferences cannot be drawn from the record. We would have to, in effect, as a three-judge panel, overrule that. Correct. Can't do that under Miller v. Gammie. That's the problem we have. Get us out of that problem. I would then go to the conclusion by Dr. Lucking that this is the only treatment available is wrong, because we've heard there's other treatments available, and the conclusion by Dr. Lucking that this is medically appropriate is wrong. What one arm of the government wants to do is give psychotropic drugs to my client that are not approved by another arm of the government. The FDA doesn't approve this treatment for this condition. I thought Dr. Klineser testified that he himself has used this in an off-label way to treat his own patients. In the civil arena, he has. Not court-ordered. As I understand the problem, this is such a rare and extreme form of delusional disorder that there are no known drugs that have ever been developed to treat it because the potential patient base is so small that there's no financial incentive for a pharmaceutical company or research doctors to spend a lot of time and money trying to research a drug to treat it. Is that right? You're exactly right. There's no financial incentive, one, but two, it's such an infinitesimal amount of people, you can't get a blind study, per se. And so what you're faced with, which Dr. Lucking has done the last 20 years, he's treated a half a dozen of these patients, and he's seen some success. No way do we know why the success was there. We don't know if it was the drugs. We don't know if the inmates said, well, gosh, if I go with the program and I answer the questions correctly, I'll be able to leave this facility. Has Dr. Lucking experienced any untoward results? He indicates he's seen side effects, and I believe in, I want to say, 50% of the patients, but his side effects range from muscle spasms to it goes the range. He has not experienced any death or anything catastrophic of that nature. So his testimony was if we see something indicating, say, the beginning of tardive dyskinesia, we can treat that with other drugs, and we've done that successfully in the past, particularly with short-term administration of psychotropic drugs. That's his testimony, Ron, and I picture my client being injected with these psychotropic drugs, which the FDA doesn't approve, and they watch to see if anything else goes wrong, so then they're going to inject him with something else to solve that problem in the hopes that in six months he's going to be competent. But we do have the testimony in the record that it has been done successfully with, as you say, a dozen or more patients in the past that Dr. Lucking has treated. A dozen or so patients have been successful. There's no way to say if it was because of the drugs or not. Okay. Do you want to save some time? If I could just save the remainder, Your Honor. Of course. Thank you. All right. Let's hear from the government. This is an impossible situation, so we want good advice from you. I'll do my best, Your Honor. All right. Good morning. Tim Ohms from the U.S. Attorney's Office in Spokane on behalf of the government. Your Honors, I'd like to focus my remarks on factors two and three of the cell test because I think that's really where the battle's joined here. And if I have time, I would like to also address this question of less intrusive alternatives, but I think the real focus of this is on one and two. Just briefly. You said one and two.  One and two. One and two. Yeah, one and two. One, of course, is whether or not there's an important interest. I think I have to address that because of the amount of time that Mr. Gillenwater's already spent in custody, and that's also the issue for which there's the noble review. I mean, you can address that if you want, but it seems to me two and three or maybe two and four are the ones that are bothering me the most. That's fine. I'll move on if that's not an issue. Well, I note that, Judge Tallman, in your questions, you've already indicated a clear awareness of the record and why the district court found this to be so serious. We have carefully studied the record. We read the transcript, and we've got basically rulings by two very fine district judges who are very troubled by the case that is presented before them. Well, on to factor two then. I think that what was significant here is that we had this case out there, this Ninth Circuit case, Ruiz-Gaxiola, where the Ninth Circuit was very critical at that time of the scientific basis that kind of was the foundation for the district court's decision to involuntarily medicate the defendant. So how do we distinguish that case from this one? Well, I think we distinguish it the way other courts have distinguished it, and first by recognizing, as Judge Peterson did, that Ruiz-Gaxiola did not stand for the proposition that involuntary medication was never appropriate for delusional disorder. It's a case-by-case question, and it has to be considered on that basis. And there's an argument that the real concern in Ruiz-Gaxiola with regard to the scientific standard was the relative inexperience of the government expert in that case. He, in fact, had never treated anyone with psychotropic drugs who had suffered from delusional disorder. And he wasn't board certified, and he'd only worked with the institution for a short period of time. And this case is different. In this case, we were able to present the testimony of Dr. Lucking, board certified since 1982. He has been at the Federal Medical Center at Butner since 1998. He's treated, relatively speaking, many patients with delusional disorder. Since it's a rare disorder, it's, again, a relative term. More importantly, he's treated them in the inpatient context, which is different than Dr. Cloninger's experience. He's also treated them with medication. Inpatient and in prison. Inpatient and in prison. So that's a unique set of experiences that the defense expert in this case, Dr. Cloninger, really couldn't bring to the table. Well, what do you think we should do? I don't understand what you're saying. I think that we should follow the advice of the doctor, Dr. Lucking. And how do you characterize that advice? What should be done? There should be the district court's order to involuntarily medicate the defendant should be affirmed so that that process can go on. The order specified that it would occur over a four-month period and that it would occur based upon the dosages that Dr. Lucking testified. Has, in fact, the treatment begun? No, it has not. All right. So are you suggesting that we can distinguish Ruiz-Gaxiola on the record, that here we have a better and more complete factual record to which the district court made findings and in essence rejected Dr. Cloninger's suggested treatment protocol in favor of Dr. Lucking's and applying the Hinkson standard, we should defer to that finding? Yes, Your Honor. Is that your position? That's the government's position. There were two experts that testified. There was testimony offered by both parties. The district court had the responsibility to make a decision based upon what was presented to it. Judge Succo made a specific finding in his order that he found Dr. Lucking credible. Dr. Lucking's opinion was very specific that there was a reasonable likelihood that the treatment with medication that he had recommended would result in a restoration of the defendant's competency. Conversely, Dr. Lucking testified that the behavioral model that was presented by Dr. Cloninger, which is treating the defendant through psychotherapy, would not be effective, that it was not an effective alternative. So the contrast between the testimony could not have been more clear, and the district court found the testimony of Dr. Lucking to be more credible and better founded upon the available scientific literature. And the finding of ineffectiveness under the Cloninger treatment plan was based on what? The fact that the psychotherapy that Dr. Cloninger recommended could not be effectively implemented, first because Gillenwater doesn't admit or accept that he has a disease and therefore doesn't see any need for treatment, and that's critical to voluntary psychotherapy. Correct, Your Honor. And I don't know that the district court really went into a full criticism of Dr. Cloninger or his expertise or his opinions, although Dr. Lucking did provide a little bit more of that because there was a difference in opinion about really what delusional disorder was and what its root causes were. Dr. Lucking testified that the most recent scientific literature expressed the view, the understanding, that it was basically an issue with chemistry and genetics as opposed to behavior. Mr. Rome, it seems to me that it's sort of putting the cart before the horse. If you're saying that the behavioral model won't be effective until Mr. Gillenwater accepts that he has a delusion, the moment he accepts that he has a delusion, he's cured. He just says, I have a delusion, I'll get rid of the delusion. Isn't part of the behavioral model to convince him that he has a delusion and get over it? Well, all I can do is refer back to the expert, which was Dr. Lucking, who said that that's not effective because everything gets absorbed or interpreted through the context of the delusion. It's not something you can talk a person out of. What would be the downside to attempting the behavioral model and seeing if it's ineffective before proceeding to the involuntary medication procedure? I think that, as Judge Tallman indicated, there was a great deal of concern by the court just how this would work because, as Dr. Cloninger described it, it was simply just a matter of giving him the option. He doesn't have to submit to it. It had to be a free choice on his part. And it had to be a psychologist that he could choose. And he has refused that free choice without any dispute? Or has he not? What's the record on that? I think the position by the psychiatrist at Butner was that it's just not an effective treatment modality. It's not effective. That's the testimony. So it's not a direction that the staff at Butner was going to pursue. Well, what are you telling us we should do? I don't understand you. I'm asking this court to affirm the order of the district court to allow involuntary medication for a period of four months, specifically as set forth in Judge Peterson's original order. And I might also point out with regard to this less intrusive alternative, even the court in Ruiz-Gaxiola, which again was, when you read that opinion, it was pretty critical of, I don't want to say the government in general, but critical of the scientific underpinnings for what the government was proposing. They rejected Dr. Cloninger's lesser alternative option as well. They found that if it weren't for the problems it had with factors 2 and 4, it would have found that factor 3 was met. And they were very positive otherwise toward Dr. Cloninger's testimony. They just found that it was completely unworkable. Related question. Unworkable because it's in that institutional setting and he would view anybody who tried to offer psychotherapy to him as yet another agent of the government conspiracy against him? Essentially, there are no boundaries on it. It's just what you're supposed to do is give the defendant, tell the defendant, here's the phone book, here's the list of psychologists you can call. You're free to seek counseling if you want or psychological counseling. But now we're back to my conundrum, but the patient doesn't realize he's sick, so why would he need a psychiatrist? I think, again, that that's part of the reason why that proposal was rejected in Ruiz-Gaxiola. And, again, in Dr. Lucking's view, it's not something reasonable to discuss because there's no reason to believe that that would ever be effective. With regard to what I might also point out just as a distinction between this case and Ruiz-Gaxiola, I think the only study that was presented in the Ruiz-Gaxiola case was the ERBL study, and I don't intend to get into an in-depth discussion of the scientific literature. That was the 2007 study? I forget the year of the ERBL study. It may have been before that, but it was the study where it was a study of 22. It was a retrospective review of treatment of 22 patients over 13 years, indicating that 77% of them responded to treatment with the medication. That looks to me like kind of an internal study done by staff at Butner. In this case, there were additional studies that were presented, the Mantrax study. There was a 2006 article that was referenced with 10 out of 11 patients having complete remission with the use of the drugs, and there was also discussion of an upcoming study that even included broader surveys of 132 defendants treated specifically under cell over a six-year period. Fifteen of those had delusional disorder, and 73% were restored to competency. Didn't the district court reference that there was essentially that Dr. Lucking had presented more current research study information than what Dr. Cloninger was relying on? That's true, and Dr. Cloninger, in essence, agreed with that fact. Dr. Cloninger was not aware of the Mantrax study or the other studies that were cited by Dr. Lucking, although he was aware of the ERBL study. And there were other criticisms of the scientific method used in those studies, but Dr. Lucking testified that just because they're not a double-blind study doesn't mean that they're not acceptable as scientific evidence and that it was, in fact, possible to draw reasonable conclusions from them. Just since I have 50 seconds left, just let me briefly reference the side effects. I think the principal thing here is that Dr. Lucking has significant experience with the side effects. The side effects that were of most concern were long-term. Those side effects take a long period of time to develop. The treatment that's proposed here is short-term. Dr. Lucking also testified that with short-term treatment, even if the person's not fully restored to competency but their condition improves, other treatment modalities are opened up that are less intrusive. Is there any evidence that short-term treatment, four-month treatment, causes long-term effects? Not in the record that we have here. As I understand it, there are other drugs that they could provide him, but it requires his voluntary cooperation because they're basically oral medications. Correct. One idea here was if he has some improvement, that opens the door to other alternatives, which further lessens the reduced... So essentially it would be a restoration to enough competency so that he'll voluntarily take the other drug. For purposes of reducing the risk of side effects, yes. So that's another way that it can be managed. My time's up, Your Honor. All right, unless anyone has any further questions. Well, I'd still like to know what you recommend we do. I'm asking that you affirm the order of the district court, which ordered involuntary treatment for a period of four months in this case. Thank you. Thank you very much, Mr. Olmes. Your Honor, to counter Mr. Olmes and Ruiz-Gaxiola, they were extremely critical of the scientific basis. But they had a different record. We have a far more complete record than what our panel had before it in Ruiz, isn't that right? I agree. However, the additional studies, they're not a medical consensus. They're anecdotal. There is no blind studies. Basically, you've got one doctor in the United States government who says, well, this is what I've experienced. Okay, but the district court heard the testimony. Dr. Cloninger and Dr. Lucking were both cross-examined vigorously. And the district court concluded that Dr. Lucking offered the better opinion as to the treatment that should be afforded to Mr. Gillenwater. Don't we have to give some deference to the district court's rejection of Dr. Cloninger's criticism of those studies? I think you do, Your Honor. However, under SELL, it has to be the least intrusive to the person. As I understand it, we only have two choices here. Either we go the psychotherapy route or we go involuntary medication. And the district court made an express finding that psychotherapy wouldn't work in this case because of Dr. Gillenwater's current medical condition. So if there's no other alternative, isn't it true that the involuntary medication is the least intrusive available? It's sort of the last resort? If the government were not to be allowed to medicate him, they still have the option of going for a civil commitment or doing other avenues to protect society. But at this point, it's speculative as to whether he could be civilly committed. We don't know. We don't know the answer. Dr. Lucking wouldn't even give an opinion as to whether or not he was civilly committable. Correct. The last thing I would like to say is, in the last testimony of Mr. Gillenwater, I think my last question to him was, would you be amenable to treatment? He thought about it and said, yes, he would. And when he was first examined in Seattle, he said he was on antidepressants previously and he would be amenable to go back on them. Don't we also have testimony from the doctor that he refused treatment when it was offered him at Butner? I'm not aware of him ever being offered any treatment at Butner. In fact, Dr. Lucking, I thought— I thought it's in Lucking's report that he basically refused treatment. When he went to Butner, he did not cooperate with anybody. Because he thinks that's all part of the grand conspiracy. The cover-up is there. He's in the heart of the cover-up. And if he discloses anything to these people, it will be used against him. But to answer Justice O'Connor's question, if I get an order saying you're not getting involuntarily medicated, the government can't be involved in your treatment, I can find you doctors that are outside the government, I think that would solve the problem. Thank you, Your Honor. But those doctors are going to have to visit him at Butner in the institution. Absolutely, Your Honor, just like I do. We can't do it on an outpatient basis, as Dr. Cloninger was suggesting. That would be preferable. You can do anything you want. Well, but we have to keep an eye on the safety of the community. Exactly, Your Honor. But that's exactly it. We bring in a doctor, and he comes in however is appropriate, either weekly or biweekly. And I attempt to convince my client we've got somebody on our side. I thought he thought you were part of this conspiracy. That's today, Your Honor, and tomorrow he may not. All right, okay. Thank you, Your Honor. Thank you. A very interesting case. The case just argued is submitted. We'll get you a decision as soon as we can. The next case on the calendar, Sherpa v. Holder, is submitted on the brief. We will now hear argument in United States v. Gerald Lynn Bainbridge, number 13-30017. Mr. Campbell, whenever you're ready to proceed. Good morning, Your Honors.
judges: O'connor, Tallman, Bea